## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| ANDREW LEE FLOWERS, JR.,<br>     Plaintiff<br><br>     v.<br><br>WEXFORD HEALTH SOURCES, INC.,<br>*et al.*,<br>          Defendants | No. 19 CV 6423<br><br>Judge Jeremy C. Daniel |

### MEMORANDUM OPINION AND ORDER

Two months after undergoing corneal transplant surgery on his left eye, Plaintiff Andrew Lee Flowers Jr. was arrested and incarcerated at the Kane County Jail ("Kane County") and the Stateville Correctional Facility ("Stateville"). Flowers brings this suit, pursuant to 42 U.S.C. § 1983, alleging that various healthcare workers at Kane County and Stateville violated his rights under the Eighth Amendment through their deliberate indifference to his postoperative condition. (R. 147 ("TAC").)[1] Flowers also asserts an Illinois state law medical malpractice claim. (*Id.*) Before the Court are five motions for summary judgment filed by Wexford Health Sources, Inc. ("Wexford"), and medical staff at Kane County and Stateville. (R. 235.)[2]

---

[1] For ECF filings, the Court cites to the page number(s) set forth in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate.

[2] The four other moving defendants are Patricia Burke M.D., the physician-in-charge at Kane County (R. 242), Victoria Plummer (R. 225) and Jessica Ortegon (R. 228), nurses at Kane County ("together, "the Defendant Nurses"), and Claude Owikoti, a physician's assistant at Statesville. (R. 231.)

For the following reasons, Owikoti's and the Defendant Nurses' motions are granted. Wexford's and Dr. Patricia Burke's motions are granted in part and denied in part.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[3] the materials cited therein, and other aspects of the record in this case. All facts are genuinely undisputed unless otherwise noted.

### I. FLOWERS UNDERGOES CORNEAL TRANSPLANT SURGERY.

On July 19, 2016, following an injury at work, Flowers was diagnosed with a corneal laceration and ruptured globe of his left eye. (Burke's Resp. to Pl.'s SOAF ¶¶ 1–2.) He underwent surgery to repair the wound. (*Id.* ¶ 2.)

Six months later, in February 2017, Flowers was referred to an ophthalmologist named Greg Berdy. (*Id.* ¶ 3; R. 246, Exhibit H ("Berdy Dep.") at 8:12–16.) Flowers complained to Dr. Berdy of tearing and blurry vision. (Burke's Resp. to

---

[3] *See* Owikoti's Statement of Material Facts, (R. 233) ("Owikoti's SOF"); Plaintiff's Response to Owikoti and Statement of Additional Facts, (R. 259) ("Pl.'s Resp. to Owikoti and SOAF"); Owikoti's Response to Plaintiff's Statement of Additional Facts, (R. 279) ("Owikoti's Resp. to Pl.'s SOAF"); Burke's Statement of Material Facts, (R. 241) ("Burke's SOF"); Plaintiff's Response to Burke and Statement of Additional Facts, (R. 255) ("Pl.'s Resp. to Burke and SOAF"); Burke's Response to Plaintiff's Statement of Additional Facts, (R. 274) ("Burke's Resp. to Pl.'s SOAF"); Plummer's Statement of Material Facts, (R. 226) ("Plummer's SOF"); Plaintiff's Response to Plummer and Statement of Additional Facts, (R. 261) ("Pl.'s Resp. to Plummer and SOAF"); Plummer's Response to Plaintiff's Statement of Additional Facts, (R. 277) ("Plummer's Resp. to Pl.'s SOAF"); Ortegon's Statement of Material Facts, (R. 229) ("Ortegon's SOF"); Plaintiff's Response to Ortegon and Statement of Additional Facts, (R. 257) ("Pl.'s Resp. to Ortegon and SOAF"); Ortegon's Response to Pl.'s SOAF"); Wexford's Statement of Material Facts, (R. 236) ("Wexford's SOF"); Plaintiff's Response to Wexford and Statement of Additional Facts, (R. 255) ("Pl.'s Resp. to Wexford and SOAF"); Wexford's Response to Plaintiff's Statement of Additional Facts, (R. 275) ("Wexford's Resp. to Pl.'s SOAF").

Pl.'s SOAF ¶ 3; Berdy Dep. at 19:9–11.) Dr. Berdy observed significant corneal damage and diagnosed Flowers as legally blind. (Burke's Resp. to Pl.'s SOAF ¶ 3.)

On November 9, 2017, Dr. Berdy performed a corneal transplant on Flowers' left eye. (*Id.* ¶ 4; Berdy Dep. at 8:17–19.) Afterward, Dr. Berdy prescribed Flowers four eye medications: an ointment called Erythromycin, an antibiotic ointment called Tobradex, an anti-inflammatory drop to treat intraocular pressure and the attendant risk of glaucoma called Istalol, and a steroid drop called Lotemax. (Burke's Resp. to Pl.'s SOAF ¶ 5.) Dr. Berdy prescribed Lotemax as part of Flowers' life-long treatment plan in light of his opinion that any corneal transplant surgery carries an inherent life-long risk of rejection. (*Id.* ¶ 6; Berdy Dep. at 130:11–131:8.)

Flowers visited Dr. Berdy again on November 15 and December 1, 2017. (Burke's Resp. to Pl.'s SOAF ¶ 7.) During each visit, Dr. Berdy continued Flowers' course of treatment on the four eye medications. (*Id.*)

At the December visit, Dr. Berdy instructed Flowers to return in four weeks. (*Id.* ¶ 9.) Dr. Berdy also prescribed Flowers three one-month supply refills of the Lotemax and Tobradex and twelve one-month refills of the Istalol and Erythromycin. (*Id.* ¶ 8.) Records from the Walgreens where Flowers picked up these medicines show that Flowers' Lotemax prescription had three refills remaining as of December 11, 2017. (*Id.*) The parties dispute whether these prescriptions had an end date of December 31, 2017. (*Id.* ¶¶ 8–9; Pl.'s Resp. to Burke and SOAF ¶ 31.)

## II.  FLOWERS IS TAKEN INTO CUSTODY.

However, on December 30, 2017, before Flowers could visit Dr. Berdy again, Flowers was arrested and taken into custody on an outstanding warrant. (Burke's Resp. to Pl.'s SOAF ¶ 10.)

### A.  Flowers Enters Kane County Jail.

Flowers entered Kane County's custody on January 8, 2018. (*Id.* ¶ 11.) Kane County's policies require that, upon arrival, all individuals undergo an intake screening performed by an emergency medical technician ("EMT"). (*Id.* ¶¶ 14–15.) If a patient reports any medications, the policy requires the examining EMT to note such on their intake form. (*Id.*) The EMT then must attempt to verify the prescription's validity with the patient's community provider or pharmacy. (*Id.*) If verification is not possible, the physician-in-charge would then use her medical judgment to decide whether to prescribe or discontinue the medication. (*Id.* ¶ 16.)

Consistent with these policies, when Flowers arrived at Kane County, he was interviewed by EMT Melissa Lamesch. (*Id.* ¶ 17.) Lamesch noted on Flowers' intake form that he had sustained an injury to his left eye in October 2017 and was taking Erythromycin, Tobradex, Istalol, and Lotemax. (*Id.*) She also noted that Flowers was arrested before he could complete a follow-up with his doctor. (*Id.*)

On January 9, 2018, EMT David Bullis received a "Patient Task" asking him to call the pharmacy Flowers reported having filled his prescriptions, Walgreens, to verify his prescriptions. (*Id.* ¶ 18; Pl.'s Resp. to Burke and SOAF ¶ 30; R. 246, Exhibit G ("Bullis Dep.") at 55:2–23.) When Bullis called, the pharmacy reported that none of

Flowers' identified eye medicines were current prescriptions, and they were last refilled more than a year and a half ago. (Burke's Resp. to Pl.'s SOAF ¶ 18; Pl.'s Resp. to Burke and SOAF ¶¶ 30–31; Bullis Dep. at 58:14–16.)

Dr. Burke, the physician-in-charge at Kane County, reviewed Flowers' intake form on January 10. (Burke's Resp. to Pl.'s SOAF ¶ 20; R. 246, Exhibit B ("Burke Dep.") at 143:1–18.) Based on her review, Dr. Burke understood that Flowers had surgery a few months prior and that he had likely been prescribed Erythromycin, Tobradex, Istalol, and Lotemax in connection with that surgery. (Burke's Resp. to Pl.'s SOAF ¶ 20; Burke Dep. at 147:12–14.) Upon learning that Flowers' medicines could not be verified by Walgreens, Dr. Burke made the medical judgment to issue her own prescription for Istalol in its generic form, Timolol. (Burke's Resp. to Pl.'s SOAF ¶ 21; Pl.'s Resp. to Burke and SOAF ¶ 32; Burke Dep. at 156:9–157:12.) Dr. Burke prescribed Flowers one Timolol drop daily in his left eye. (R. 234-1 at 11.)

Each of the Defendant Nurses administered the Timolol drops to Flowers as directed by Dr. Burke during their shifts on three different occasions (meaning that Flowers received Timolol drops six times from the Defendant Nurses). (Plummer's Resp. to Pl.'s SOAF ¶ 49; Ortegon's Resp. to Pl.'s SOAF ¶ 23.) It is disputed whether Flowers requested or informed the Defendant Nurses that he needed additional medicines for his eye. (Plummer's Resp. to Pl.'s SOAF ¶ 28; Ortegon's Resp. to Pl.'s SOAF ¶ 28; R. 246, Exhibit A ("Flowers Dep.") 63:6–65:15.) Further, although it is disputed whether Flowers reported eye pain while at Kane County jail, he experienced emotional distress due to the fear of becoming blind in his left eye.

5

(Burke's Resp. to Pl.'s SOAF ¶¶ 37, 51; Flowers Dep. at 63:6–65:15, 289:15–19.) During his time at Kane County, the Timolol that Dr. Burke prescribed was the only medication that Flowers received for his eye. (Burke's Resp. to Pl.'s SOAF ¶ 25.)

### B. Flowers is Transferred to Stateville.

On January 18, 2018, Flowers was transferred from Kane County to Stateville. (*Id.* ¶ 26.) Upon arrival at Stateville, Claude Owikoti, a physician's assistant, met with Flowers for a physical examination. (Owikoti's Resp. to Pl.'s SOAF ¶ 28.) Flowers told Owikoti that he was having trouble with his eyes, specifically complaining of blurry vision in his left eye related to a traumatic eye injury in June 2016. (*Id.*; Pl.'s Resp. to Owikoti and SOAF ¶ 35; R. 234-1 at 5; R. 234-3, Exhibit 4 ("Owikoti Dep.") 47:5–10, 72:1–13.) Without identifying any medicines by name, Flowers told Owikoti that he needed additional medication for his eye. (Owikoti's Resp. to Pl.'s SOAF ¶ 28; Flowers Dep. at 113:8–22, 117:11–14.)

Owikoti examined Flowers' left eye. (Owikoti's Resp. to Pl.'s SOAF ¶ 28; Owikoti Dep. at 50:19–20.) He noted that Flowers' pupils were reacting to light and had no redness or swelling. (Pl.'s Resp. to Owikoti and SOAF ¶ 36; Owikoti Dep. at 50:23–51:3, 52:1–7.) At the conclusion of the visit, Owikoti continued Flowers on the Timolol eye drops, which was the only current eye medication listed in his transfer records from Kane County. (Owikoti's Resp. to Pl.'s SOAF ¶ 26; Pl.'s Resp. to Owikoti and SOAF ¶ 39; Owikoti Dep. 55:2–14; R. 234-1 at 11.) He did not prescribe Flowers any new medications. (Owikoti's Resp. to Pl.'s SOAF ¶ 28.)

III.   **FLOWERS IS TRANSFERRED TO SHERIDAN CORRECTIONAL CENTER AND RELEASED FROM CUSTODY.**

In February 2018, Flowers was transferred to Sheridan Correctional Center ("Sheridan"), where he remained until the completion of his sentence in December 2019. (Burke's Resp. to Pl.'s SOAF ¶¶ 28, 32.) Upon intake, Flowers was referred for a visit with Sheridan's on-site ophthalmologist, Dr. Russell. (*Id.* ¶ 28.)

On March 6, 2018, Dr. Russell treated Flowers and prescribed a steroid eye drop called Prednisolone to reduce the risk that his corneal transplant would be rejected. (*Id.* ¶ 29.) The parties dispute whether Wexford's policies permitted Dr. Russell fifteen-minute appointments with his patients and whether Wexford had a policy for obtaining a patient's medical records. (Pl.'s Resp. to Wexford and SOAF ¶¶ 33, 35.) Nevertheless, contrary to his practice outside of Wexford, Dr. Russell did not contact Dr. Berdy despite knowing of Flowers' recent surgery. (*Id.* ¶ 35.) Additionally, there is evidence that, since January 2018, Wexford staff knew that Dr. Russell was frequently absent from work, internally describing him as unreliable and ineffective, and that these shortcomings were causing a backlog of eye appointments for inmates. (*Id.* ¶¶ 36–37.) Wexford, though, did not replace Dr. Russell until that fall. (*Id.* ¶ 37.)

Further, treatment providers at Sheridan like Dr. Russell, may seek collegial review from a specialist at the University of Illinois at Chicago Medical Center ("UIC"). (Wexford's Resp. to Pl.'s SOAF ¶ 66.) During Flowers' stay at Sheridan, Dr. Russell requested twelve referrals for Flowers to see an eye specialist at UIC, which Wexford approved. (*Id.* ¶¶ 48, 65, 67.) Accordingly, in May, Flowers was seen by Salima Hassanaly, an ophthalmology fellow at UIC. (Owikoti's Resp. to Pl.'s SOAF ¶

7

31.) Hassanaly determined that Flowers had suffered a "[f]ailed corneal transplant due to [the] lapse in treatment with prednisolone (drops that prevent failure/rejection) in the critical early postoperative period." (*Id.*) Hassanaly defined the "critical early postoperative period" as the first few months following a corneal transplant. (*Id.*)

Flowers' expert witness, Dr. Raiji, opined that Flowers not receiving steroid drops during January and March of 2018 led to his corneal transplant rejection. (Owikoti's Resp. to Pl.'s SOAF ¶ 35; R. 234-11 ("Raiji Report") ¶ 15.) She also opined that the rejection necessitated increased steroid dosing, multiple visits to practitioners, and caused a life-long risk of glaucoma. (*Id.*) Further, Dr. Raiji opined that the lapse in steroid treatment may also have exacerbated the loss of peripheral vision in Flowers' left eye. (*Id.* ¶ 36.)

## IV. PROCEDURAL HISTORY

Flowers' third amended complaint asserts that Dr. Burke, Owikoti, the Defendant Nurses and Wexford violated the Eighth Amendment (Count I),[4] and an Illinois medical malpractice claim against Dr. Burke and Wexford (Count III). Dr. Burke, Owikoti, the Defendant Nurses, and Wexford have each filed motions for summary judgment on Flowers' claims. (R. 225; R. 228; R. 231; R. 235; R. 242.)

## LEGAL STANDARD

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Donald*

---

[4] 28 U.S.C. § 1331 confers this Court with jurisdiction over Count I and the Court may exercise supplemental jurisdiction over Count III pursuant to 28 U.S.C. § 1367(a).

*v. Wexford Health Sources, Inc.*, 982 F.3d 451, 457 (7th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). "And summary judgment is inappropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 963 (7th Cir. 2019) (citation omitted). In ruling on the present motions, the Court "interpret[s] all facts and draw[s] all reasonable inferences in favor of the nonmoving party." *Id.*

## ANALYSIS

### I.  MOTIONS TO STRIKE

#### A.  Dr. Burke

The Court begins by addressing Dr. Burke's motion to strike Flowers' expert, Dr. Raiji. (R. 243 at 4.) "The admission of expert testimony is specifically governed by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 (1993)." *Smith v. Ford Motor Co.*, 215 F.3d 713, 717–18 (7th Cir. 2000). "Rule 702 states: 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." *Heard v. Ill. Dep't of Corr.*, No. 06 C 0644, 2012 WL 2524748, at *1 (N.D. Ill. June 29, 2012) (citing Fed. R. Civ. P. 702). "Together, Rule 702 and *Daubert* provide that an expert's testimony is admissible if: 1) the witness is qualified, 2) the expert's methodology is reliable, and 3) the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Zollicoffer v. Gold Standard Baking,*

*Inc.*, 335 F.R.D. 126, 145 (N.D. Ill. 2020) (citing *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010).

"An expert's proponent has the burden of establishing the admissibility of the opinions by a preponderance of the evidence." *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019). "The Rule 702 inquiry 'is a flexible one,'" *Zollicoffer*, 335 F.R.D at 145 (quoting *Daubert*, 509 U.S. at 594), focusing "solely on principles and methodology, not on the conclusions they generate." *Winters v. FruCon Inc.*, 498 F.3d 734, 742 (7th Cir. 2007). "The district court has significant latitude in determining how to measure the reliability of the proposed expert and whether the testimony is in fact reliable." *Ortiz v. City of Chi.*, 656 F.3d 523, 536 (7th Cir. 2011). Further, "[d]eterminations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

Dr. Burke first attacks Dr. Raiji's qualifications by arguing that Dr. Raiji, as an ophthalmologist, lacks foundation to render a standard of care opinion for Dr. Burke, an internal medicine physician. (R. 243 at 4.) "While a doctor's medical degree does not make him qualified to opine on all medical subjects, the doctor need not be a specialist in a given field as long as he has the knowledge, training, and education to reach his conclusions." *Vandervelden v. Saint Louis Univ.*, 589 F. Supp. 3d 944, 951 (S.D. Ill. 2022) (citing *Gayton*, 593 F.3d at 953). The relevant medical testimony in this case concerns an eye condition, a topic on which Dr. Raiji can opine given her background, training, and experience working in ophthalmology. Specifically, Dr.

10

Raiji has been an ophthalmologist since 2012. (Raiji Report at 41.) Dr. Raiji's curriculum vitae reflects that she obtained her Doctor of Medicine from the University of Michigan in 2007 and completed her ophthalmology residency at the George Washington University Hospital in 2011. (*Id.* at 39.) Dr. Raiji has maintained board certification with American Board of Ophthalmology throughout her career and is a member of four professional ophthalmology organizations. (*Id.*) She has also worked as an ophthalmologist in clinical settings and as a Professor of Ophthalmology. (*Id.*) The Court accordingly declines to strike Dr. Raiji as an expert on this basis. (R. 274 at 33.)

Dr. Burke next argues that Dr. Raiji's testimony should be stricken because her "opinion is based on a wrong fact." (R. 243 at 5–6.) This argument refers to Dr. Raiji's opinion that Dr. Burke did not reconcile Flowers' medications as the Wexford guideline required. (*See* Burke's Resp. to Pl.'s SOAF ¶ 34.) But the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact"; they do not bear on admissibility. *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015). Accordingly, Dr. Burke's motion to strike Dr. Raiji as an expert is denied.

### B.   Wexford

Next, Wexford objects to the Court relying upon any testimony from Dr. Russell because he was not disclosed as an expert witness. (Wexford's Resp. to Pl.'s SOAF ¶ 33.) "[A]ll witnesses who are to give expert testimony under the Federal Rules of

Evidence must be disclosed under Rule 26(a)(2)(A)." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004). An expert witness may offer expert opinions based on their "knowledge, skill, experience, training, or education." *Varlen Corp.*, 924 F.3d at 459. Lay witnesses, however, offer testimony "rationally based on [their] perception." Fed. R. Civ. P. 701(a). Here, Dr. Russell is not offering expert opinion based on his medical training; rather, his testimony describes his personal knowledge of Wexford's policies as he understood them with respect to his day-to-day job duties. (*See* Pl.'s Resp. to Wexford and SOAF ¶¶ 33–35.) Wexford's objection is overruled.

## II.   DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED.

The Court now turns to the substance of Flowers' claims. Flowers brings his federal claims pursuant to § 1983, which "creates a private right of action against any 'person' who violates the plaintiff's federal rights while acting under color of state law." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (quoting § 1983). He first charges Dr. Burke, Owikoti, the Defendant Nurses, and Wexford, with deliberate indifference to his postoperative condition in violation of the Eighth Amendment. "The Eighth Amendment proscribes 'deliberate indifference to serious medical needs of prisoners' amounting to 'the unnecessary and wanton infliction of pain[,]'" *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), because, in such cases, it can be fairly said that "the official has inflicted cruel and unusual punishment." *Wilson v. Seiter*, 501 U.S. 294 (1991). The Court proceeds by analyzing the evidence against Dr. Burke,

12

Owikoti, and the Defendant Nurses in their personal capacities, and then analyzing the evidence against Wexford.

### A.  Dr. Burke, Owikoti, and the Defendant Nurses

With respect to Dr. Burke, Owikoti, and the Defendant Nurses, "[t]o determine if the Eighth Amendment has been violated" the Court "perform[s] a two-step analysis, first examining whether [Flowers] suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016). There must also be evidence to support a jury finding "that delay in medical treatment exacerbated an injury." *Stockton*, 44 F.4th at 615.

As in many cases of this nature, the parties' dispute turns on the issue of deliberate indifference. *E.g.*, *Walker*, 940 F.3d at 964. To determine if any of the parties are entitled to summary judgment, the Court must "look at the totality of [Flowers'] medical care" to determine "whether that care evidences deliberate indifference to serious medical need." *Petties*, 836 F.3d at 727–28. "Deliberate indifference is a subjective mental state," *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022), and, thus, Flowers must come forward with evidence of "something more than negligence or even medical malpractice[.]" *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022); *see also Estelle*, 429 U.S. at 10 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain.'"). Rather, "'[s]omething akin to recklessness' is needed," *Reck*, 27 F.4th at 483 (citation omitted); *i.e.*, there must be evidence that the caregiver knew of and consciously disregarded a substantial risk of harm to him.

*Rasho*, 22 F.4th at 710. Because "[w]hether a reasonable jury could possibly find for the plaintiff depends on the knowledge each individual defendant had regarding [Flowers'] condition, and how each defendant responded to [his] requests for medical attention," the Court analyzes the evidence of each respective defendant's subjective mental state in turn. *Gayton*, 593 F.3d at 621.

### 1.    Dr. Burke

Flowers argues that a jury could conclude that Dr. Burke ignored an obvious risk to Flowers. (R. 254 at 12–13.) While Flowers is correct that, "[n]ormally a jury may infer the subjective (awareness of a substantial risk) from the objective (obviousness of a risk)," "[c]ases of medical judgment are different." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* at 261–62.

The Court must "defer to medical professionals' treatment decisions unless there is evidence that 'no minimally competent professional would have so responded under those circumstances'" because "medical professionals may choose from 'a range of acceptable courses based on prevailing standards in the field[.]'" *Walker*, 940 F.3d at 965 (citation omitted). "A treating physician" like Dr. Burke, "[b]y claiming that [s]he was exercising [her] medical judgment" is "'asserting that [s]he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.' The plaintiff cannot reach the jury

without evidence to overcome that deference to medical judgment." *Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019) (citation omitted).

Dr. Burke argues that she is entitled to summary judgment because there is no evidence that her treatment was a substantial departure from accepted professional judgment. (R. 273 at 8–10.) Specifically, Dr. Burke testified that she decided to discontinue the steroid by considering how steroids themselves carry risks, they can damage the eye by causing intraocular pressure or cataracts, and how Flowers had been prescribed medication to reduce inner eye pressure. (Burke's Resp. to Pl.'s SOAF ¶¶ 22, 34; Burke Dep. 157:8–12.) Dr. Burke also decided that Flowers was not likely taking the four medications he reported at intake because two months had passed since his surgery, Flowers' pharmacy could not verify the prescriptions, and patients commonly report an outdated list of medications. (Burke's Resp. to Pl.'s SOAF ¶ 22.) There is also evidence from Dr. Burke's expert, Dr. Nijm, approving of Dr. Burke's treatment decisions. Specifically, Dr. Nijm, approved of Dr. Burke's medical judgment that steroids carry known side effects and added that using steroids does not guarantee the transplant will not be rejected. (R. 246 at 556–67.)

For his part, Flowers points to the opinions of his expert, Dr. Raiji. (R. 254 at 12–13.) Dr. Raiji opines that Dr. Burke failed to follow the applicable standard of care when she "failed to determine what kind of medication Flowers needed and failed to determine what medication was prescribed to him." (Raiji Report at 27–28.) In Dr. Raiji's opinion, the evidence shows that there was a discrepancy between what Flowers reported to be taking and what Walgreens reported. (*Id.*) In such

circumstances, "[s]tandard of care would have dictated at this point to follow up." (*Id.* at 28.) As an example, Dr. Raiji opined that Dr. Burke could have "called [Flowers'] surgeon, obtain[ed] his records or consult[ed] with a doctor of similar qualifications to [] Flowers's surgeon." (*Id.*) Flowers also relies upon testimony from Dr. Hassanaly that the delay of steroidal treatment caused the failed transplant. (R. 254 at 14.)

Such evidence is insufficient to create a genuine factual dispute as to deliberate indifference, however. "Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole*, 94 F.3d at 261 (citing *Estelle*, 429 U.S. at 107); *Stockton*, 44 F.4th at 616 ("[E]vidence that some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."); *Reck*, 27 F.4th at 484–85. Flowers may disagree with Dr. Burke's decision to discontinue the steroid drop, but absent evidence that "no minimally competent professional would have so responded under those circumstances,'" his claim fails. *Walker*, 940 F.3d at 965 (citation omitted). The Court therefore grants judgment for Dr. Burke on Count I.

### 2. Owikoti

With respect to Owikoti, Flowers argues that the evidence creates a genuine dispute of material fact about whether Owikoti ignored an obvious risk to him, departed from accepted professional judgment, or persisted in knowingly ineffective

treatment. (R. 258 at 12.) Even when viewed in the light most favorable to Flowers, though, the evidence shows that Owikoti is entitled to judgment in his favor.

Owikoti's expert opined that he complied with the standard of care and there was no medical basis for Owikoti to know that Flowers' unspecified request for "additional medications" meant that he was seeking steroid treatment. (Pl.'s Resp. to Owikoti and SOAF ¶ 59.) Owikoti's expert further said nothing in Flowers' records would have put a physician on notice that Flowers was at a serious risk of harm. (*Id.* ¶ 61.) Critically, Flowers has supplied no evidence to the contrary; his expert, Dr. Raiji, gave no testimony about Owikoti. (*Id.* ¶ 56.) Because Flowers cannot point to evidence that Owikoti's treatment was outside the bounds of medical professionalism, no reasonable jury could return a verdict in his favor.

Similarly, there is no evidentiary support for a jury to conclude that Owikoti substantially departed from accepted professional judgment or persisted in knowingly ineffective treatment. (R. 258 at 13); *see Petties*, 836 F.3d at 729–30. Though Flowers said he needed "more medicines," he did not tell Owikoti that his Timolol was ineffective and there is no evidence Owikoti should have known Flowers meant steroid treatment. For all these reasons, the Court grants judgment for Owikoti on Count I.

### 3.    The Defendant Nurses

The Court now considers the Defendant Nurses' motions for summary judgment. Each Defendant Nurse supplied Flowers with his Timolol eyedrops on three separate occasions during his time at Kane County. (Plummer's Resp. to Pl.'s SOAF ¶ 21; Ortegon Resp. to Pl.'s SOAF ¶ 23.) The same basic principles applicable

to Dr. Burke and Owikoti apply to the Defendant Nurses, but it is also "important to take into account . . . that . . . . [a]s a general matter, a nurse can, and indeed must, defer to a treating physician's instructions." *Reck*, 27 F.4th at 485.

Still, summary judgment is not warranted if some evidence would permit a jury to conclude that the Defendant Nurses demonstrated "blind or unthinking" deference to Dr. Burke. *Id*. Such is shown by evidence that either nurse was aware of Flowers' pain and the ineffectiveness of the medications but delayed in notifying Dr. Burke. *Id*. For example, in *Berry v. Peterman*, the Seventh Circuit reversed a grant of summary judgment where a nurse received the plaintiff's complaints of pain for nearly six weeks, but never followed up with the doctor on whether an examination was necessary. 604 F.3d 435, 443 (7th Cir. 2010).

There is no comparable evidence in this case. Rather, the evidence shows the Defendant Nurses followed Dr. Burke's treatment plan, and the record does not indicate that they had reason to know that the plan may have been ineffective. "Simply adhering to the medication regime prescribed" does not show deliberate indifference for a nurse even if doing so "may not have been the optimal course to follow in light of [the plaintiff's] complaints of pain." *Reck*, 27 F.4th at 48.

Unlike *Berry*, the Defendant Nurses did not know Flowers was in pain because he did not tell them so. Flowers response brief says that there is evidence that the Defendant Nurses "knew about Flowers' pain and discomfort," citing to paragraphs 22, 25, 27–28 of his Statement of Additional Facts. (R. 261 at 14; *see also* R. 256 at 14

(citing to Ortegon's Resp. to Pl.'s SOAF ¶¶ 23, 28.) None of those paragraphs describes Flowers telling the Defendant Nurses about experiencing pain, however.

Only paragraph 28 describes Flowers' interaction with the Defendant Nurses. (*See* Plummer's Resp. to Pl.'s SOAF ¶ 28.) This paragraph is consistent with Flowers testimony that "every time" medical personnel "came in[to]" his cell he would " ask[] them about [his] eye drops." (*Compare id.*, *with* Flowers Dep. 65:11–15.) These requests would not have alerted the Defendant Nurses that Dr. Burke's treatment plan was ineffective. Absent any proof that the Defendant Nurses knew that Flowers was referring to steroid treatment and that not receiving such put him at risk, there was no reason for either nurse to question Dr. Burke's prescribed treatment plan. In sum, there is no evidence to conclude that either of the Defendant Nurses were deliberately indifferent toward Flowers' objectively serious medical condition. The Court grants judgment for the Defendant Nurses on Count I.

### B. Wexford

The Court now considers Flowers' § 1983 claim against Wexford. As set forth above, Flowers has failed to adduce evidence of deliberate indifference based on the individual defendants' actions. But the Court must also consider whether Wexford "might be liable even if its individual agents are not." *Glisson*, 849 F.3d at 378. "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Id.* "This is a high bar." *Dean*, 18 F.4th at 235. "If a municipality's action is not facially unconstitutional, the plaintiff 'must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.'"

*Id.* (citation omitted). "Finally, the plaintiff must show that the municipal action was 'the 'moving force' behind the federal-rights violation.'" *Id.* (citation omitted). The Court addresses each of the five policies Flowers identifies as indicative of Wexford's deliberate indifference toward the medical needs of incarcerated persons in turn.

### 1. Policy of Delaying Specialist Referrals

Flowers asserts that Wexford had a policy of delaying specialist referrals. (TAC ¶¶ 20, 41.) Wexford argues summary judgment is warranted because there is no evidence that it had any control over UIC's scheduling or that Wexford was aware of any delays that would amount to constitutional violations such that it would have been put on notice. (R. 244 at 3–4.) Flowers did not respond to this argument in his response brief, and thus waived any argument to the contrary. *See Palmer v. Marion Cnty.,* 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned).

Even so, there is no evidence that earlier appointments were available and/or that Wexford denied them, and the undisputed evidence shows that Wexford approved all twelve specialist referrals sought while Flowers was at Sheridan. (Pl.'s Resp. to Wexford and SOAF ¶¶ 67–69.) And Flowers has supplied no evidence that other inmates experienced delays in being referred to UIC. As such, there is no evidence from which a jury could conclude that Wexford had a deliberately indifferent policy. Indeed, in *Walker*, the Seventh Circuit concluded that evidence that Wexford knew "some referrals slipped through the cracks" was not proof of "Wexford's knowledge that constitutionally necessary referrals were not happening with such

frequency that it ignored an obvious risk of serious harm." *Walker*, 940 F.3d at 967. Accordingly, it is evident that, in the absence of any proof that Wexford had any knowledge of delays, Flowers' claim cannot survive summary judgment.

## 2. Verification Policy

Second, Wexford seeks summary judgment on Flowers claim that Wexford has a policy of limiting or discouraging providers from determining the proper medication inmates were prescribed by community providers. (TAC ¶ 42; R. 244 at 9–10.) Flowers again failed to respond to the arguments raised in Wexford's motion and so he has waived any argument to the contrary. *See Palmer,* 327 F.3d at 597–98. Regardless, there is no evidence that Wexford was subjectively aware of any issues with its policy of requiring prison officials to verify new inmates' medicines by contacting the inmate's community prescribing clinician or pharmacy.

## 3. Fifteen-Minute Visit Per Patient Policy and No Policy for Receiving Outside Medical Records

Next, Wexford seeks summary judgment on Flowers' claims that it maintained a fifteen-minute visit per patient policy that could only be extended in the case of an emergency and had no policy for obtaining a patient's medical records. (*See* R. 262 at 13–14; R. 276 at 12–14.) Dr. Russell testified that he believed he could have provided better care if Wexford permitted longer appointments. (Pl.'s Resp. to Wexford and SOAF ¶ 33.) Dr. Russell complained to the Sheridan Health Care Administrator that the fifteen-minute appointments felt rushed but was told that "because of the amount of inmates that needed to be seen, the appointments had to be kept [to] four per hour. (*Id.*) This meant that for patients with complex medical histories requiring testing

21

like Flowers, Wexford policies required Dr. Russell to recall him at a future date, which could be three to four weeks in the future. (*Id.*) Also, due to Wexford not having any policy for obtaining prior records, contrary to his practice outside of Wexford, Dr. Russell did not contact Dr. Berdy upon learning of Flowers' recent surgery. (*Id.* ¶ 35.)

This evidence fails to create a genuine fact dispute. Even when viewed in the light most favorable to Flowers, the absence of evidence that Wexford *knew* that its fifteen-minute visit per patient policy or lack of having a policy for obtaining a patient's medical records was risking constitutional violations prevents the conclusion that Wexford was deliberately indifferent toward the medical needs of prisoners.

### 4. Staffing of Sheridan's Ophthalmologist Position

Finally, Wexford argues it is entitled to summary judgment because there is no evidence that Wexford was deliberately indifferent by not replacing Dr. Russell sooner than Fall 2018. (R. 276 at 14.) Although Wexford knew that Dr. Russell was frequently absent and ineffective causing appointment backlogs as early as January 2018, they argue that they did not disregard the risk that Dr. Russell was providing constitutionally deficient care. *E.g.*, *Rasho*, 22 F.4th at 710 (concluding no deliberate indifference because "the evidence establishes that IDOC made reasonable efforts to cure the deficiencies in the five areas identified in the plaintiffs claim and to alleviate the staffing shortage"). Rather, Wexford asserts that the evidence shows that it contracted with additional providers to periodically assist at Sheridan. (Wexford's

Resp. to Pl.'s SOAF ¶ 37.) Wexford further explained that the delay in replacing Dr. Russell occurred because it is difficult to find providers for correctional medicine. (*Id.*)

However, there is evidence that, even in January 2018, a Wexford Regional manager responded to an email about Dr. Russell not showing up for work by saying "[t]his is at least the [fifth] time . . . something like this has happened." (264-27 at 7.) Because this evidence supports concluding that Wexford had prior knowledge of repeated issues causing a backlog of eye appointments but delayed in replacing him even before Flowers arrived at Sheridan, Wexford's motion for judgment is denied.

### III. MEDICAL MALPRACTICE

Flowers also brings Illinois state law medical malpractice claims against Dr. Burke and Wexford, Count III. The Court addresses Dr. Burke and Wexford's procedural arguments before addressing each respective party's liability.

### A. Procedural Arguments

First, Dr. Burke argues that Flowers failed to amend his complaint to attach the requisite affidavit under Illinois state law. (R. 243 at 13–14.) Illinois law requires medical malpractice plaintiffs to "file an affidavit, attached to the original and all copies of the complaint," stating that "there is a reasonable and meritorious cause" for litigation. *Young v. United States*, 942 F.3d 349, 350 (7th Cir. 2019) (quoting 735 ILCS 5/2-622(g)). However, § 622(g)'s requirement that an affidavit be attached to a complaint is a procedural rule that does not apply when an Illinois medical malpractice claim is filed in federal court. *Id.* at 351. Instead, Federal Rule of Civil Procedure 8, which does not require attachments to a complaint, controls. *Id.* In federal court, summary judgment is the deadline for complying with § 622(g). *Id.* at

352–53. Even after a motion for summary judgment is filed, Rule 56(d) allows the Court to grant a plaintiff additional time to comply. *Id.* at 352. Considering *Young*'s liberal interpretation of the affidavit requirement, the fact that Flowers attached the affidavit to his summary judgment response and did not disclose it at an earlier time is not fatal to his claim. *Id.* at 351.

Because Rule 8 does not require a complaint to have attachments, it follows that Flowers did not need to amend his complaint to properly submit the report. (*See* R. 273 at 12–13.) Dr. Burke's argument that Flowers could not properly submit the report by attaching it to his response brief because "[a] Plaintiff cannot amend his complaint in response to summary judgment," is therefore misplaced. (*Id.*) The Court accordingly concludes that Flowers has sufficiently complied with § 622(g) by attaching his expert's affidavit to his response brief.

Second, Wexford argues that Flowers' malpractice claim must be dismissed as untimely. (R. 276 at 3–6.) Illinois requires malpractice plaintiffs to file their action within two years "after the date on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death for which damages are sought in the action, whichever of such date occurs first[.]" 735 ILCS 5/13-212(a). "[A]ll that is required to start the statute of limitations running is knowledge of the injury and that the defendant or an employee of the defendant acting within the scope of his or her employment may have caused the injury." *Arteaga v. United States*, 711 F.3d 828, 831 (7th Cir. 2013). Wexford's argument fails, because even assuming without deciding that the operative

date was May 2018, Flowers' first amended complaint, which first named Wexford, "relates back to the date of the original complaint for purposes of tolling the statute of limitations[.]" *Henderson v. Bolanda*, 253 F.3d 928, 931 (7th Cir. 2001; (R. 19.) Flowers' first complaint was filed on September 23, 2019, making the operative date within the applicable limitations period. (R. 1.)

**B.** **There is a Genuine Dispute of Material Fact Regarding Whether Dr. Burke Committed Malpractice**.

"Under Illinois law, a medical malpractice plaintiff must establish the following elements: "(1) the standard of care in the medical community by which the [medical provider's] treatment was measured; (2) that the [medical provider] deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Midland State Bank v. United States*, 634 F. Supp. 3d 498, 511 (N.D. Ill. 2022).

First, Dr. Burke argues that Flowers cannot show any standard of care deviation because Dr. Raiji "only criticized Dr. Burke for purportedly not following Wexford's guideline for medication reconciliation at intake." (R. 243 at 14–15.) As stated above, however, Flowers has presented a dispute of fact as to this issue, since Dr. Raiji testified that Dr. Burke should have reconciled Flowers' medications upon learning of his recent surgery. (*See* Raiji Report ¶ 114.)

Second, Dr. Burke argues that there is no evidence to support a jury finding in Flowers' favor regarding causation and damages. (R. 243 at 15.) Not so. Dr. Raiji and Dr. Hassanaly concluded that Flowers has suffered a corneal transplant rejection. (Burke's Resp. to Pl.'s SOAF ¶¶ 30, 34.) Dr. Raiji also opined that the cause of the

25

rejection was a lapse in steroid drops between January and March of 2018. (Burke's Resp. to Pl.'s SOAF ¶ 34.) This testimony is sufficient to create a genuine dispute of material fact regarding whether Dr. Burke's failure to prescribe Flowers additional medication constituted malpractice. Accordingly, Dr. Burke's motion for summary judgment on Count III is denied.

### C. There is No Genuine Dispute of Material Fact Regarding Whether Wexford Is Vicariously Liable for Dr. Burke.

Flowers also seeks to hold Wexford vicariously liable for Dr. Burke's actions. "Generally, a person injured by the tortious action of another must seek his or her remedy from the person who caused the injury." *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2012). "The principal-agent relationship is an exception to this general rule." *Id.* Relatedly, "no vicarious liability exists for the actions of independent contractors." *Id.* Nevertheless, "Illinois has adopted vicarious liability for '[o]ne who entrusts work to an independent contractor, but who retains control of any part of the work.'" *Bokodi v. Foster Wheeler Robbins*, 728 N.E.2d 726, 731 (Ill. 2000). Wexford argues that it is entitled to summary judgment because the evidence shows that it did not control Dr. Burke's work. (R. 244 at 12.)

Whether Wexford "[r]etained control" over Burke "is a question of fact that may be decided on summary judgment only if there is insufficient evidence to create a factual dispute." *Liszkiewicz*, 2017 WL 4512836, at *3. "The best indicator of whether a defendant retained control sufficient to trigger the potential for liability . . . is the written agreement between the defendant and the contractor." *Foley v. Builtech Constr., Inc.*, 160 N.E.3d 78, 86–87 (Ill. App. 2019). In this respect, Wexford points to

26

a provision of Wexford's contract with Kane County that states: "Wexford will not exercise control over the manner or means by which these independent contractors perform their professional medical duties." (R. 276 at 10–11.) Additionally, the Wexford guidelines disclaimed any control over Dr. Burke: "[t]hese guidelines do not replace sound clinical, operational, or administrative judgment, nor are they intended to strictly apply to all patients." (*Id.* at 11.)

Still, "even if the agreement[s] provide[] no evidence the defendant retained control, evidence of the defendant's conduct at variance with the agreement may still demonstrate that control." *Foley*, 160 N.E.3d at 87. Flowers points to "Wexford's documents admit[ting] that Dr. Burke was part of Wexford." (R. 262 at 9; Wexford's Resp. to Pl.'s SOAF ¶ 26.) There is also evidence that Wexford maintained a "Site Management Team" at Kane County which provided "hands-on site-level supervision." (Wexford's Resp. to Pl.'s SOAF ¶ 26.) Dr. Burke was a member of this team. (*Id.* ¶ 27.) Because this evidence does not show that Wexford had control over Dr. Burke's decision-making regarding patient-specific care, it fails to create a genuine dispute. Flowers' argument that Dr. Burke was controlled by the Wexford guidelines also mistakenly ignores Dr. Burke's testimony that she was not required to follow the guidelines while providing medical treatment to inmates at the Jail. (Wexford's Resp. to Pl.'s SOAF ¶ 31.) The Court accordingly grants judgment in Wexford's favor on Count III.

## CONCLUSION

For the foregoing reasons, Claude Owikoti's [231], Victoria Plummer's [225], and Jessica Ortegon's [228] motions for summary judgment are granted. Patricia

27

Burke's motion [242] is granted with respect to Count I and denied with respect to Count III. Wexford's motion [235] is denied with respect to Count I and is granted with respect to Count III. On or before June 21, 2024, the parties shall submit a joint status report that includes a list of the remaining claims and defendants, the anticipated length of trial, and any trial conflicts in the months of October, November, or December 2024.

Date: June 3, 2024

JEREMY C. DANIEL
United States District Judge